EW TRUCK & EQUIPMENT CO., Plaintiff

v.

BOB COULTER d.b.a. SOUTH PACIFIC
EQUIPMENT AND REPAIR, Defendant

SOUTH SEAS SHIPPING CO., through its agent
MATAI MARITIME AGENCY, Inc., Plaintiff

v.

S.P.E.A.R. CO. and EW TRUCK & EQUIPMENT CO.,
Defendants

PATRICK COFFIN, Third-Party Defendant

High Court of American Samoa
Trial Division

CA No. 59-90
CA No. 62-90

May 6, 1991

Before REES, Associate Justice, VAIVAO, Associate Judge, LOGOAI, Associate Judge.

Counsel: For Plaintiff EW Truck & Equipment Company,
 Robert A. Dennison III
 For Plaintiff South Seas Shipping Company,
 Charles V. Ala'ilima
 For Defendants S.P.E.A.R. Company and Bob Coulter,
 Roy J.D. Hall, Jr.

These consolidated cases concern contracts for the sale of a truck and its shipment from California to American Samoa. Plaintiff EW Trucking claims that defendant Coulter, then doing business in the name of "SPEAR Co.," agreed to purchase a certain 1966 Ford "bucket truck" for $37,000.60 plus shipping costs of $12,168. Defendant claims that he did not agree to purchase the truck on behalf of himself or SPEAR but only on behalf of third-party defendant Patrick Coffin.

By the time the truck arrived in American Samoa, the deal had gone bad; nobody picked up the truck from the dock or paid the $12,168 shipping charges. Plaintiff South Seas Shipping Co./Matai Maritime Agency claims this amount plus interest, costs, and attorney fees against both EW and SPEAR.

The two main issues in the dispute between EW and SPEAR are (1) whether SPEAR agreed to purchase the truck or only to arrange for a sale by EW to Coffin and (2) whether the agreement of the parties included a condition that the truck be insulated against electric current.

On the first issue, we find for plaintiff EW. Numerous facsimile transmissions between EW and SPEAR, both before and after the truck was shipped to American Samoa, reflect what appears to have been the understanding of both parties that SPEAR wanted to buy the truck from EW. Although EW knew SPEAR intended to resell the truck to someone else in American Samoa and that this customer had participated in the selection of the truck from various trucks available from EW and was arranging to finance his purchase through a local bank, it is clear that EW regarded this person not as its own customer but as SPEAR's. This appears not only from the various preliminary communications but also from the evidence immediately surrounding the transaction itself. When SPEAR requested EW to make an exception to its usual policy of requiring cash or a letter of credit before shipping

merchandise, EW's chief executive officer told Mr. Coulter of SPEAR that he could authorize this only because SPEAR had made immediate payment on another recent substantial purchase from EW, and that he was relying on SPEAR's promise that payment for the truck would be made immediately upon delivery. We are unable to find that EW would have made such an exception had it been relying only on the credit of Mr. Coffin --- a person with whom it had had no previous dealings and whose name it did not even know --- or even that SPEAR reasonably believed that EW would do this. A few days later, just after the truck had been loaded onto the ship, EW sent SPEAR an invoice by facsimile transmission. The invoice prominently stated that the truck was being "SOLD TO" SPEAR. SPEAR did not protest its designation as the buyer but instead sent a return facsimile to assure EW that payment would be made shortly. We conclude that the parties understood the contract as one by which EW reasonably believed it was selling the truck to SPEAR for resale to SPEAR's own unidentified customer.[1]

On the question of insulation, however, SPEAR prevails. During the negotiations leading up to the sale, EW sent a facsimile transmission asking: "Does the boom need to be insulated?" SPEAR responded the same day: "Boom needs to be insulated." EW appears to maintain that this condition was waived or superseded by a later exchange between the parties, during which the 1966 truck was substituted for a 1974 truck SPEAR had originally wanted to buy but which was not ready for shipping. EW informed SPEAR that the 1966 truck, although in use by an electrical contractor, would not be "serviced or certified" before being shipped to American Samoa. The reasoning seems to be that since insulation is one of the things a truck must have in order to be certified, SPEAR's decision to take the uncertified truck meant that it was no longer insisting on insulation. The evidence does

---

[1] Evidence was admitted of various unsuccessful efforts by the parties to mitigate their damages by entering into substitute contracts involving the truck. Under some of these arrangements EW would have reasserted ownership of the truck and would have dealt directly with buyers (or, under one proposed arrangement, a lessee) other than SPEAR. We admitted this evidence over the objection of counsel for EW, for any light it might shed on the parties' understanding about the original contract between SPEAR and EW. We conclude that the attempts to mitigate damages were just that. They were fully consistent with the existence of a binding contract of sale between EW and SPEAR and did not deprive EW of its right to sue on that contract.

not reflect, however, that SPEAR knew or should have known that an uncertified truck was necessarily an uninsulated one. Indeed, it appears that both SPEAR and EW assumed that the 1966 truck was in fact insulated, until about two months after it had arrived in American Samoa, when an inspection by the local power authority appears to have revealed the contrary. The agreement of SPEAR to accept a truck that had not been certified did not amount to a waiver or modification of its earlier, strong insistence that the truck's boom be insulated.

The weight of the evidence is to the effect that the boom is not insulated but that it can be insulated. Although we have no evidence of what it will cost to insulate the truck, we do have evidence that the cost will not be commercially unreasonable in relation to the contract price. The evidence for this proposition is the testimony of Mr. Coffin, the customer at whose instance SPEAR originally specified that the boom must be insulated. Mr. Coffin has at all times been willing to purchase the truck provided financing can be arranged and is confident that the boom can be insulated without such expense as to make the truck not worth buying.

It is not uncommon for each party to a contract to do things which, assuming no breach by the other party, would amount to a breach of the contract. In such situations the first breach is usually deemed to excuse what otherwise would have been the subsequent breach by the other party. In the present case, however, each party breached the contract before finding out about the other party's independent breach. SPEAR did not reject the truck because it failed to conform to the insulation term of the contract; rather, it wrongfully rejected the truck because it did not have the money to pay for it. Similarly, EW cannot excuse its failure to provide conforming goods by reference to SPEAR's wrongful rejection, because it provided the goods before it had any idea such rejection would occur. Under these circumstances, and in the absence of any dimension of malice or wilfulness in either party's breach, the most appropriate remedy is to give each party the benefit of the bargain to which it agreed and was entitled. EW is entitled to the contract price of $37,000.60; SPEAR is entitled to a truck that conforms to all terms of the contract, including the requirement of an insulated boom. SPEAR is obliged to pay the shipping costs, as provided by the contract between the parties. Under the circumstances each party should bear its own costs and attorney fees, and a $2,500 charge for dock storage charges, which was paid by EW, should be evenly divided between the parties.

64

We further find that Patrick Coffin agreed to purchase the truck from SPEAR for $37,250.60 plus shipping costs. SPEAR and Coffin have a contract for the purchase of the truck for $49,418.60, subject to the condition that the boom be insulated. Coffin is also obliged to indemnify SPEAR for its $1,250 share of the dock storage charges, since these charges would not have been incurred if he had paid for the truck when it arrived at the dock.

We conclude that plaintiffs South Seas Shipping and Matai Maritime have the right to recover the shipping charges either from the shipper (EW) or the consignee (SPEAR). This was an explicit term of the contract of carriage set forth in the bill of lading, which was given to EW when it delivered the truck to the dock. It is also a standard term in such contracts, to which both EW and SPEAR, as merchants who have frequent occasion to do business with shipping companies, would be assumed to agree in the absence of an explicit provision to the contrary. SPEAR is obliged to pay the shipping charges not only by the terms of the contract of carriage, into which EW entered upon SPEAR's explicit instructions, but also by the terms of its contract with EW. As between EW and SPEAR, therefore, SPEAR is primarily liable and would be obliged to indemnify EW for any amounts the latter should be required to pay the shipping company.

South Seas/Matai Maritime, however, has already collected the full $12,168 it is owed for shipping the truck. On January 3, 1990, about six weeks after SPEAR and EW had become obligated to pay the shipping costs, the Comptroller of a company called Harbor Stevedoring sent a letter to SPEAR acknowledging that his company owed $10,528.10 for equipment it had purchased from SPEAR but stating that Harbor Stevedoring intended to withhold payment of its debt to SPEAR pending settlement of the shipping costs for the bucket truck. By April or May of 1990, additional purchases had increased the amount of Harbor Stevedoring's debt to SPEAR to at least $12,168. Although Mr. Coulter of SPEAR initially protested the non-payment of the debt from Harbor Stevedoring, he eventually agreed with the manager of Harbor Stevedoring (who is also the manager of Matai Maritime and the local manager of South Seas Shipping) that the $12,168 owed to SPEAR could be withheld pending the outcome of this litigation.

Harbor Stevedoring is, or was in January 1990, partly owned by South Seas Shipping, with the remainder of its stock being owned by the same people who own South Seas Shipping and Matai Maritime. After the events giving rise to this litigation, Harbor Stevedoring merged with

Matai Maritime; the successor entity, Harbor Maritime, is therefore a party to the present case. (Counsel should have moved to substitute Harbor Maritime for its predecessor Matai Maritime as a named plaintiff, lest the Court give judgment in the name of a nonexistent corporation.) Business decisions for all these entities, or at least for their operations in American Samoa, appear to have been made by the same person or persons at all times relevant to the litigation. Although the three companies may nevertheless be entitled to insist on being treated as separate entities for most purposes, in this case they found it to their advantage to treat themselves as a single enterprise and should therefore be so treated by the Court.

The gist of the January 1990 letter is that the management of the three entities had decided to apply the SPEAR debt to South Seas as an offset against the Harbor Stevedoring debt to SPEAR. The money --- which the letter acknowledges to have been immediately due and payable to SPEAR --- was not placed in an escrow account, deposited in the registry of the Court, or otherwise sequestered so that neither party would have the use of it pending the outcome of the litigation. Rather, it was (and remains) available for the use of the Harbor/Matai/South Seas entities at the full discretion of the common management thereof. The practical situation of the parties during the past year has been identical to that in which they would have found themselves if Harbor Maritime had written a check for $12,168 to SPEAR and SPEAR had written an identical check to South Seas. It is therefore appropriate that the debt from SPEAR to South Seas be satisfied out of the funds withheld from SPEAR by South Seas' sister entity and co-plaintiff, Harbor Maritime.

Because South Seas was able to collect its debt by self-help soon after it became due, it is unnecessary for us to determine whether the term in the bill of lading which makes the shipper and consignee liable for "expenses" should be broadly construed to supply a contractual basis for an award of attorney fees to South Seas.

Accordingly, plaintiff EW Truck & Equipment will have judgment against defendant Coulter (dba SPEAR) in the amount of $38,250.60 with pre-judgment interest at the legal rate of six percent from December 4, 1990, for a total of $41,501.90. Judgment will enter against plaintiff EW Truck & Equipment, requiring it to insulate the boom on the truck within sixty days. If plaintiff EW should fail to comply with this part of the judgment, defendant Coulter will have the right to rescind the contract of sale. Defendant Coulter will have judgment against third-party defendant Coffin in the amount of

66

$50,668.60 plus interest at the legal rate for a total of $54,975.43, due upon tender of the truck after it has been insulated. Execution of the money judgments will be stayed for sixty days.

It is so ordered.